UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

HEATHER M. HOOGERHEIDE,    )
    )
    Plaintiff,    )   Case No. 1:14-cv-00658
    )
v.    )
    )   Honorable Paul L. Maloney
COMMISSIONER OF    )
SOCIAL SECURITY,    )
    )
    Defendant.    )
_____ )

## OPINION

This is a social security action brought under 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security denying plaintiff's application for disability insurance benefits (DIB). On May 2, 2011, plaintiff filed her application for benefits. (Page ID 200-06). She claimed a March 30, 2003, onset of disability. (Page ID 200). Her disability insured status expired on June 30, 2008. Thus, it was plaintiff's burden on her claim for DIB benefits to submit evidence demonstrating that she was disabled on or before June 30, 2008. *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Plaintiff's claim was denied on initial review. (Page ID 121-25). On December 4, 2012, plaintiff received a hearing before an administrative law judge (ALJ), at which she was represented by counsel. (Page ID 63-114). On January 30, 2013, the ALJ issued his decision finding that plaintiff was not disabled. (Page ID 43-56). On April

29, 2014, the Appeals Council denied review (Page ID 28-31), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a complaint seeking judicial review of the Commissioner's decision. She asks the Court to overturn the Commissioner's decision on the following grounds:

1.      The ALJ violated the treating physician rule.

2.      The ALJ gave no valid reasons for rejecting plaintiff's complaints.

3.      New and material evidence mandates a remand to the Commissioner.

(Plf. Brief at 2, Dkt. 12, Page ID 839).  The Commissioner's decision will be affirmed.

## Standard of Review

When reviewing the grant or denial of social security benefits, this Court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the Court's review is limited.  *Buxton*, 246 F.3d at 772.  The Court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations.  *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive

. . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013)("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from March 30, 2003, through June 30, 2008, but not thereafter. (Op. at 3, Page ID 45). Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of March 30, 2003, through her date last insured, June 30, 2008. (*Id.*). Through her date last disability insured, plaintiff had the following severe impairments: "cervical stenosis (status post C6 corpectomy and

diskectomy, fusion at C4-C5, and plating at C4-C7), osteoporosis, right trochanteric bursitis, anxiety, depression, and right eye blindness." (*Id.* at 3-4, Page ID 45-46). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (*Id.* at 4, Page ID 46).

The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of sedentary work:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant had the maximum ability to occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; stand and walk for a total of 2 hours in an 8-hour workday; and sit for a total of 6 hours in an 8-hour workday. The claimant could occasionally climb ramps and stairs but would not be able to climb ladders, ropes, and scaffolds. She could occasionally balance, stoop, kneel, crouch, and crawl. The claimant would have to avoid concentrated exposure to vibrations, hazards (such as unprotected heights and dangerous moving machinery), and extreme cold. She could not operate leg or foot controls and could not ambulate on uneven terrain. The claimant should avoid flexion, extension, rotation, or side to side bending of the head greater than 45 degrees in any direction. Further, she could not perform work that would present objects to her from the right side on a conveyor belt or otherwise. The claimant would also need to alternate sit/stand every 30 to 60 minutes. She would have to be able to use a cane to aid ambulation any time she is up and about. Finally, the claimant would be limited to simple unskilled work.

(Op. at 6, Page ID 48). The ALJ found that plaintiff's testimony regarding her subjective functional limitations was not fully credible. (*Id.* at 6-11, Page ID 48-54).

The ALJ found that through her date last insured, plaintiff was not able to perform any past relevant work. (*Id.* at 12, Page ID 54). Plaintiff was 43 years old as of her date last insured. Thus, she was classified as a younger individual at all times relevant to her claim for DIB benefits. (*Id.*). Plaintiff has a limited education and is

able to communicate in English.  (*Id.* at 13,  Page ID 55).  The transferability of work skills was not an issue because all plaintiff's past relevant work was unskilled.  (*Id.*).  The ALJ then turned to the testimony of a vocational expert (VE).  In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 4,195 jobs in Michigan's Lower Peninsula that the hypothetical person would be capable of performing.  (Page ID 109-111).  The ALJ found that this constituted a significant number of jobs.  Using Rule 201.24 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled.  (Op. at 13-14, Page ID 55-56).

## 1.

Plaintiff asks the Court to remand this matter to the Commissioner under sentence six of 42 U.S.C.  § 405(g) for consideration of new evidence.  (Plf. Brief at 19-20, Page ID 856-57; Reply Brief at 5, Page ID 1086).  The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the Court's review is limited to the evidence presented to the ALJ.  *See Jones v. Commissioner*, 336 F.3d at 478; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  The Court is not authorized to consider plaintiff's proposed additions to the record in determining whether the Commissioner's decision is supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Cline*, 96 F.3d at 148.

"A district court's authority to remand a case for further administrative proceedings is found in 42 U.S.C. § 405(g)."  *Hollon ex rel. Hollon v. Commissioner*, 447

F.3d 477, 482-83 (6th Cir. 2006). The statute permits only two types of remand: a sentence four (post-judgment) remand made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision; and a sentence six (pre-judgment) remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision. *Hollon*, 447 F.3d at 486 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99-100 (1991)); *see DeLong v. Commissioner*, 748 F.3d 723, 725 n.3 (6th Cir. 2014); *Allen v. Commissioner*, 561 F.3d 646, 653-54 (6th Cir. 2009). The Court cannot consider evidence that was not submitted to the ALJ in the sentence four context. It only can consider such evidence in determining whether a sentence-six remand is appropriate. *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster v. Halter*, 279 F.3d at 357.

Plaintiff has the burden under sentence six of 42 U.S.C. § 405(g) of demonstrating that the evidence she now presents in support of a remand is "new" and "material," and that there is "good cause" for the failure to present this evidence in the prior proceeding. *See Hollon*, 447 F.3d at 483; *see also Curler v. Commissioner*, 561 F. App'x 464, 475 (6th Cir. 2014); *Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010). Courts "are not free to dispense with these statutory requirements." *Hollon*, 447 F.3d at 486.

Plaintiff offers a number of documents generated in 2013 and 2014 in support of her claim that she was disabled on or before June 30, 2008. On March 27, 2013, plaintiff underwent a brain MRI. Glenn Zimmerman, M.D., described the findings as "suspicious for primary demyelinating disease" and noted that the findings "need[ed]

to be correlated with clinical examination as well as potentially obtaining CSF for demyelinating disease markers." (docket # 12-1, Page ID 858). On April 29, 2014, Michael Paciorek, M.D., interpreted an MRI of plaintiff's brain taken on that date as showing that plaintiff's condition had remained stable since the March 2013 study. The "[d]eep white matter changes, although not pathognomonic for, would be consistent with a demyelinating process such as MS." (docket # 12-2, Page ID 859). On May 14, 2014, Herman Sullivan, M.D., dictated a two paragraph letter indicating that plaintiff was diagnosed with MS in 2013. According to Dr. Sullivan, plaintiff had some symptoms dating back as early as 2000. He indicated that plaintiff had experienced some changes in her gait and balance over time. (docket # 12-3, Page ID 860). The proffered evidence is new because it was generated after the ALJ's decision. *See Ferguson*, 628 F.3d at 276; *Hollon*, 447 F.3d at 483-84.

"Good cause" is not established solely because the new evidence was not generated until after the ALJ's decision. *See Courter v. Commissioner*, 479 F. App'x 713, 725 (6th Cir. 2012). The Sixth Circuit has taken a "harder line." *Oliver v. Secretary of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986). The moving party must explain why the evidence was not obtained earlier and submitted to the ALJ before the ALJ's decision. *See Ferguson*, 628 F.3d at 276. Plaintiff has not carried her burden of demonstrating good cause.

Finally, in order to establish materiality, plaintiff must show that introduction of the evidence would have reasonably persuaded the Commissioner to reach a different conclusion. *See Ferguson*, 628 F.3d at 276. Plaintiff's disability insured

status expired on June 30, 2008.  The MRI results form 2013 and 2014 do not purport to address the plaintiff's condition at any time during the period at issue.  Dr. Sullivan's 2014 letter provides a conclusion that plaintiff had "symptoms" as far back as early 2000, but he does not identify those symptoms.  He does mention progressive changes in gait and balance, but he has provided nothing regarding the severity of plaintiff's functional limitations during the period at issue which ran from March 30, 2003, through June 30, 2008.  He has not identified where the supporting evidence is found in progress notes or other medical evidence generated before plaintiff's date last disability insured.  The proffered evidence generated in 2013 and 2014 would not have persuaded the ALJ to reach a different conclusion on the question of whether plaintiff was disabled during the disability insured period at issue which ended on June 30, 2008.

Plaintiff has not demonstrated that remand pursuant to sentence six of  42 U.S.C. § 405(g) is warranted.  Plaintiff's arguments must be evaluated on the record presented to the ALJ.

**2.**

Plaintiff argues that the ALJ failed to give appropriate weight to the opinions of Gregory  Gadbois, M.D., a treating physician.  (Plf. Brief at 6-10, Page ID 843-847; Reply Brief at 1-3, Page ID 1082-84).  The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).  A treating physician's opinion that a patient is disabled is not entitled to any special

significance. See 20 C.F.R. §§ 404.1527(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician."). Likewise, "no special significance"[1] is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling deference. *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011). "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician. Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'" *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)). A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is

---

[1] "We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section." 20 C.F.R. § 404.1527(d)(3); *see Blankenship v. Commissioner*, No. 14-2464, __ F. App'x __, 2015 WL 5040223, at * 9 (6th Cir. Aug. 26, 20015).

"inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §
404.1527(c)(2); *see Gayheart v. Commissioner*, 710 F.3d 365, 376 (6th Cir. 2013) (A
treating physician's medical opinion is entitled to controlling weight where "two
conditions are met:  (1) the opinion 'is well supported by medically acceptable clinical
and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the
other substantial evidence in [the] case record.'" (citing 20 C.F.R. § 404.1527(c)(2)).

The ALJ "is not bound by conclusory statements of doctors, particularly where
they are unsupported by detailed objective criteria and documentation." *Buxton v.
Halter*, 246 F.3d at 773.  An opinion that is based on the claimant's reporting of her
symptoms is not entitled to controlling weight.  *See Young v. Secretary of Health &
Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414
F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a
claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight,
it should not necessarily be completely rejected; the weight to be given to the opinion
is determined by a set of factors, including treatment relationship, supportability,
consistency, specialization, and other factors.  *See Titles II and XVI: Giving Controlling
Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188
(SSA July 2, 1996)); 20 C.F.R. § 404.1527(c); *Martin v. Commissioner*, 170 F. App'x
369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons
for the weight accorded their treating sources independent of their substantive right

to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

The period at issue on plaintiff's claim for DIB benefits ran from her alleged onset of disability, March 30, 2003, through June 30, 2008, the date her disability insured status expired. Much of the evidence filed in this case falls outside the relevant time period. (Page ID 352-420, 425-45, 502-08, 581-86, 594-604, 620-27, 633-54, 676-741, 743-799, 802-18). This evidence is minimally probative and is considered only to the extent that it illuminates the claimant's condition during the relevant period. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *see also Van Winkle v. Commissioner*, 29 F. App'x 353, 358 (6th Cir. 2002).

Plaintiff was involved in a workplace accident in September 2000. She sustained a contusion of her right pelvic area against a table corner. (Op. at 7, Page ID 49; *see* Page ID 369, 386, 401, 415-16, 431). Gregory Gadbois, M.D., at Michigan Medical Family Practice, was plaintiff's primary care physician before, during, and after during the period at issue in this lawsuit. (Page ID 103, 288, 389, 439).

On July 30, 2003, plaintiff appeared at Dr. Gadbois's office for a re-evaluation of her low back pain. She reported a recent episode where "her feet gave out and there was numbness for about 10 minutes. This resolved and she ha[d] no other symptoms

-11-

like that." (Page ID 500).  Dr. Gadbois noted that plaintiff's MRI taken three years earlier "was essentially normal."  Plaintiff's motor strength was 5/5 and her deep tendon reflexes were 2+ and symmetric.  She had some generalized tenderness to palpation over the lower lumbar region." (*Id.*).

On August 8, 2003, plaintiff was evaluated at Spectrum Health by Gwen Hoffman, M.D.  Plaintiff reported lower back pain stemming from bathroom cleaning work that she had performed a day earlier.  She did not have any numbness or weakness in her lower extremities.  She was alert and oriented.  Her straight leg tests were negative bilaterally.  Plaintiff received medication and was advised to apply ice to painful areas.  (Page ID 423-24).

On August 25, 2003, the MRI of plaintiff's lumbar spine showed that her vertebral body height was normal.  The alignment of vertebral bodies was normal. There was some "mild" disc desiccation.  (Page ID 421).

On December 9, 2003, plaintiff began seeing Keith Javery, D.O., at Michigan Pain Consultants, PC, on a referral from Dr. Gadbois.  Plaintiff advised Dr. Javery that she was a "stay at home mother."  She indicated that she performed general housework.  She had not worked outside the home since April 2001.  Plaintiff was alert and oriented to person, place, and time.  There was no evidence of any upper motor neuron disturbance.  Plaintiff had fairly normal spinal curves and there was no evidence of severe spasticity in her paraspinous musculature.  Plaintiff did have a reduced range of motion and a positive straight leg raising test in the seated position at about 80 degrees.  Dr. Javery gave plaintiff an epidural injection at L4-5, the

suspected level of pain production, and plaintiff tolerated the procedure well. (Page ID 446-47). On January 12, 2004, Dr. Javery expressed frustration that plaintiff had given him "a completely different story" today regarding the cause of her injury. It was not the story she had supplied on her health intake sheet. (Page ID 448). On February, 23, 2004, Dr. Javery found that plaintiff was not experiencing progressive motor or sensory deficits. (Page ID 449).

On April 19, 2004, Dr. Javery noted that plaintiff was "extremely focused" on causative factors. Dr. Javery indicated that in his experience this was "a negative prognostic indicator" if a worker's compensation claim or lawsuit was contemplated. Plaintiff did not want any additional therapy or injections and Dr. Javery found that she was not a surgical candidate. (Page ID 451). On August 10, 2004, plaintiff returned to Dr. Javery and indicated that she may have been "a bit too hasty." She indicated that she would like to retry interventional therapy. (Page ID 452). On September 28, 2004, Dr. Javery noted that plaintiff had degenerative changes and disc bulges at L3-L4, L4-L5, and L5-S1. He recommended percutaneous neucleoplasty of the bottom three lumbar discs. (Page ID 454).

On January 6, 2005, Dr. Javery performed the three level disc decompression using percutaneous nucleoplasty. (Page ID 455, 467). On February 4, 2005, plaintiff reported that the surgery had relieved all her leg pain. She had minimal hip pain. Her straight leg raising tests were negative. She denied any grogginess from her medication. (Page ID 457).

On February 24, 2005, plaintiff reported to Dr. Javery that she was very happy with the outcome of her surgery. She had complete resolution of her leg pain and better than 80 or 90% reduction in her burning low back pain. Her range of motion had improved and there was no evidence of any neurological deficit. (Page ID 458).

On August 11, 2005, plaintiff told Dr. Gadbois that her lower back had been fine since surgery. She reported some midthoracic pain which seemed to be worse when she stretched out. Plaintiff was alert, oriented, and in no acute distress. He gave plaintiff an injection in the right trochanteric bursa and plaintiff tolerated the procedure well. (Page ID 490). On September 8, 2005, plaintiff reported a "4-day history of neck and head pain." Plaintiff suspected that her allergies were acting up. Dr. Gadbois gave plaintiff samples of Allegra and counseled her on smoking cessation. (Page ID 488).

On October 6, 2005, plaintiff was examined by Eric Hedlund, M.D., at Michigan Medical P.C., on a referral from Dr. Gadbois. Plaintiff indicated that she was unemployed. She reported a 20-pack year history of tobacco use. Her gait was normal. Her right hip had a normal range of motion. She retained 5/5 motor strength. X-rays of her pelvis revealed no evidence of arthritis, deformity, or subluxation. Dr. Hedlund encouraged smoking cessation. He treated plaintiff with an injection, gave her a home stretching and strengthening program, and gave plaintiff a prescription for Relafen. (Page ID 487).

On January 5, 2006, plaintiff told Dr. Gadbois that she had been pain free after surgery, and that she was fine until November 2005 when she started to feel the same pain as before. Plaintiff denied any weakness or incontinence. Her back examination

was normal with the exception of some tenderness over the lumbar spine. Her motor strength was 5/5 and her deep tendon reflexes were 2+ and symmetric. (Page ID 484).

On March 22, 2006, plaintiff saw Daniel Mankoff, M.D., at Michigan Pain Consultants, PC. Plaintiff reported that she had a good response to surgery, but in October 2005, she began having recurrent symptoms. Dr. Mankoff found that plaintiff's gait was mildly antalgic. She had a decreased range of motion in her lumbar spine. Her straight leg raising tests were negative and her reflexes were intact. Dr. Mankoff recommended further diagnostic evaluation with a MRI (Page ID 460). On May 2, 2006, plaintiff returned to Dr. Mankoff. He reviewed plaintiff's MRI and found that it did not show any significant degenerative changes. There was no evidence of disc herniation or stenosis. It appeared to be a relatively stable MRI. It did not explain plaintiff's report of an increase in her symptoms after the 8 months of relief provided by the nucleoplasty procedure. Dr. Mankoff initiated a trial of Methadone and gave plaintiff a lumbar epidural injection. (Page ID 459).

On November 10, 2006, Dr. Gadbois noted that plaintiff was alert, oriented, and in no apparent distress. Her motor strength was 5/5 and her deep tendon reflexes were 2+ and symmetric. Her extremities displayed no clubbing, cyanosis, or edema. Plaintiff continued to smoke between one-half pack and a full pack of cigarettes each day. Dr. Gadbois counseled plaintiff on smoking cessation. (Page ID 475).

On January 2, 2007, plaintiff's bone density study was consistent with osteoporosis. Plaintiff was encouraged to ensure adequate calcium and vitamin D

intake, participate in regular weight-bearing and/or resistive exercise, and refrain from tobacco use.  (Page ID 474).

On May 21, 2007, apparently in the context of other litigation or a worker's compensation claim, Dr. Gadbois wrote a one paragraph letter addressed to "To Whom It May Concern."  He stated that plaintiff had chronic back pain stemming from her workplace injury in 2000 and that he did not feel that plaintiff "would be in a position to work in a manual labor type job."  (Page ID 469).  On March 27, 2007, plaintiff reported to Dr. Gadbois that she did not feel that Vicodin was helping very much with her back pain.  She indicated that she had been seen at the University of Michigan for low back pain and those physicians had not identified any surgical treatments or other modalities that would benefit her.  Gadbois indicated that he did not have much to offer plaintiff, but he suggested that a trial of Oxy-Contin might be worthwhile.  (Page ID 470).

On June 20, 2007, plaintiff received a consultative examination performed by Kerstyn Zalesin, M.D.  Plaintiff stated that she had a history of anxiety.  She indicated that she used Ativan on a daily basis, but was not participating in any psychiatric therapy.  Her reported anxiety had never required hospitalization.  She indicated that she had a driver's license and drove on an occasional basis.  She continued to smoke cigarettes.  Her immediate, recent, and remote memory remained intact and her concentration was normal.  Plaintiff's extremities displayed no clubbing, cyanosis, or edema.  There was no evidence of joint laxity, crepitance, or effusion.  Her grip strength remained intact.  Her dexterity was unimpaired.  Her strength was 5/5.  Plaintiff had

no difficulty getting on and off the examination table or walking on her toes.  She had mild difficulty walking on her heels and squatting.  She walked with a "very subtle right sided limp without the use an assist device."  (Page ID 529-32).

On June 27, 2007, plaintiff received a consultative psychological examination performed by Psychologist Wayne Kinzie.  Plaintiff had no history of hospitalizations for any mental impairments and was not participating in any counseling.  She did take Ativan.  She did not have any learning disability.  She retained a valid driver's licence, but reported that she did not drive very often.  Plaintiff stated that she had mild depression problems, but her primary problems were physical.  She was oriented in all three spheres.  Psychologist Kinzie offered a diagnosis of a mild to moderate dysthymic disorder and an adjustment disorder with anxiety.  (Page ID 533-36).

On July 5, 2007, a medical consultant completed a physical residual functional capacity assessment which indicated that plaintiff was capable of performing light work.  On the same date, a psychologist completed a form indicating that plaintiff had only mild mental impairments.  (Page ID 537-58).

On December 17, 2007, the MRI of plaintiff's cervical spine indicated no abnormality at C2-3 and a very mild broad-based posterior protrusion at C3-4 and mild left neural foraminal stenosis.  At C4-5 and C5-6 there was evidence of posterior spondylosis comprised of both endplate osteophytic changes and intervertrbral disk.  At C6-7 there was a large central and dorsilateral lesion that was causing fairly marked thecal sac effacement.  The C7-T1 level was normal.  (Page ID 605-06).  On February 6, 2008, plaintiff met with James Stubbart, M.D., to discuss treatment

options.  He indicated that a surgical remedy was plaintiff's best option.  He explained that smoking cigarettes accelerates degenerative disc problems.  Smoking increased plaintiff's risk of non-union and a failed surgery.  Plaintiff expressed understanding and indicated that she was anxious to quit smoking.  (Page ID 607-09).

On March 18, 2008, Dr. Stubbart performed a C6 corpectomy with C5 to C7 anterior strut grafting with structural iliac crest allograft, anterior cervical diskectomy and fusion at C4-C5 with tricortical iliac crest allograft, and anterior cervical plating, C4-C7 with Medtronic Venture plate.  Plaintiff tolerated the procedure well and there were no complications.  (Page ID 92-93, 565-79). X-rays taken on April 1, 2008, showed that the graft was in good position.   (Page ID 576).  On April 16, 2008, plaintiff's treating surgeon noted that her incision was healing nicely and looked great.  Plaintiff was in no distress.  Plaintiff reported that the radicular symptoms in her arms had resolved.  She indicated that she still had some neck pain.  (Page ID 577).  On May 12, 2008, Dr. Stubbart noted that plaintiff was "about eight weeks out from her anterior cervical fusion."  Plaintiff continued to smoke cigarettes.  Her neck pain was "quieting down" and she did not have any neurological complaints.  Dr. Stubbart emphasized that plaintiff needed to "abstain from all exposure to nicotine and smoke because of the increased risk of nonunion" because it could lead to ongoing neck pain and the potential need for additional surgery.  (Page ID 578).

On June 25, 2008, plaintiff had no neurological symptoms in her upper extremities.  She did not complain of any specific neck pain.  Her strength was 5/5.

She reported that she had stopped using products containing nicotine.  (Page ID 579).

Plaintiff's disability insured status expired on June 30, 2008.

On August 18, 2008, Dr. Stubbart noted that plaintiff was "doing better."  She had "some headaches but otherwise the arm symptoms [had] resolved nicely[.]"  She had some right shoulder impingement and Dr. Stubbart indicated that he planned to refer plaintiff to physical therapy.  (Page ID 580).

On March 11, 2009, Dr. Stubbart noted that plaintiff was about a year out from her surgery.  He indicated that plaintiff had done very well and she was pleased with the results.  She had some neck stiffness and right sided ache.  Her arm symptoms had resolved and she was able to work again doing computer and telephone work.  Her straight leg raising tests were negative.  (Page ID  581-82).  On March 17, 2009, the MRI of plaintiff's lumbar spine indicated "[m]inimal degenerative changes."  (Page ID 585).  On March 30, 2009, Physician's Assistant Michael Parniske reported that plaintiff seemed to be functioning at a fairly high level with minimal narcotic usage. (Page ID 583-84).

On April 27, 2011, plaintiff reported to Dr. Gadbois that in the last few weeks she had developed a severe burning sensation in her right hip region which radiated down the leg.  Her recent hip x-rays were negative.  Plaintiff reported that the Vicodin and anti-inflammatories that she was taking did not appear to be helping.  Plaintiff's general examination was normal.  She had severe tenderness to palpation of her right hip and over the anterior aspect of her thigh.  She walked with a very antalgic gait. Dr. Gadbois initiated a trial of Lyrica.  (Page ID 646-47).  On June 21, 2011,  Dr.

Gadbois noted that plaintiff was accompanied by a friend.  This individual reported that "over the last year or so she ha[d] noticed a significant decline in the patient's functionality to the point where she really cannot get by without a cane."[2]  Dr. Gadbois's progress notes conclude with the following sentence:  "Of note, she is still smoking and I told her more than likely she is going to have to get off of cigarettes before any further surgery will be done."  (Page ID 652).  On February 22, 2012, Dr. Gadbois observed that there were very limited options that he could offer plaintiff for treatment.  He recommended a trial of Cymbalta.  (Page ID 701).

On October 25, 2012, Dr. Gadbois completed two RFC questionnaires for plaintiff's attorney.  The first is labeled as a "Lumbar Spine Residual Functional Capacity Questionnaire" and in it Gadbois suggested that plaintiff would "constantly" have pain or other symptoms that would interfere with the attention and concentration needed to perform simple tasks, could walk less than one block without rest or severe pain, could sit for about 2 hours and stand and walk less than 2 hours in an 8-hour workday, and could occasionally lift less than ten pounds.  Paragraph 14 of the questionnaire posed the following question:  "What is the earliest date that the description of symptoms and limitation in this questionnaire applies?"  Gadbois's response was "2000."  (Page ID 732-35).

---

[2]Plaintiff testified in January 2013 that Dr. Gadbois had prescribed a cane "over a year, almost two years" earlier to help plaintiff keep pressure off her right leg and to help her with balance.  (Page ID 104).

The second questionnaire is labeled as a "Cervical Spine Residual Functional Capacity Questionnaire." It does not contain anything suggesting that it was anything other than a current opinion as to plaintiff's RFC on October 25, 2012. It indicated that plaintiff required use of a cane and had significant limitations in reaching, fingering and handling. The same restrictions with regard to lifting, walking, sitting and standing were suggested. (Page ID 736-41).

The ALJ found that the restrictions that Dr. Gadbois suggested in his RFC questionnaire responses were entitled to limited weight because they were not well supported by objective clinical and diagnostic testing, were not supported by his contemporaneous progress notes, and failed to represent plaintiff's actual functional ability as of June 30, 2008, plaintiff's date last disability insured:

> Treating physician Gregory Gad[b]ois, M.D., opined in May 2007 that the claimant could not perform any manual labor (Exhibit 9F/1). More recently, Dr. Gad[b]ois stated that the claimant could rarely lift and carry 10 pounds; could sit for a total of 2 hours in an 8-hour work day; and could stand and walk less than 2 hours in an 8-hour workday. Dr. Gad[b]ois further indicated the claimant could not perform postural activities (Exhibit 24F). The undersigned assigns limited weight to Dr. Gad[b]ois' opinions because the clinical findings he documented at [E]xhibit 9F do not support such limitations. More importantly, Dr. Gad[b]ois' opinions are inconsistent with minimal and benign objective clinical and diagnostic testing findings that are documented at [E]xhibit 3F, 4F, 5F, 8F, 10F, and 15F. The undersigned notes the recent medical record may have documented worsening progression of the claimant's medical condition, but Dr. Gad[b]ois' opinions do not represent the actual physical functional ability the claimant had prior to her last insured date of June 2008. Dr. Gad[b]ois' opinion that the claimant could not perform manual labor work also warrants little weight because finding disability is reserved to the Commissioner and the opinion is not supported by the treatment notes.

(Op. at 12, Page ID 54).

Plaintiff criticizes the ALJ for being too vague. While specific page references in the ALJ's citations to exhibits in the above-quoted paragraph would have been preferable, they were not required, particularly in light of the ALJ's extended discussion of the supporting evidence which appears on the preceding pages of his opinion. (*Id.* at 7-12, Page ID 49-54).

Plaintiff is incorrect when she asserts that requiring that suggested RFC restrictions be supported by evidence creates an "unauthorized" corroboration requirement. The issue of the claimant's RFC is an administrative finding of fact reserved to the Commissioner. *See Blankenship v. Commissioner*, 2015 WL 5040223, at * 9. An opinion provided by a treating physician on an issue reserved to the Commissioner is not entitled to controlling weight. *Curler v. Commissioner*, 561 F. App'x 464 471 (6th Cir. 2014). It is "not entitled to any particular weight." *Id.*; *see also Johnson v. Commissioner*, 535 F. App'x 498, 505 (6th Cir. 2013). In addition, the ALJ is not bound by conclusory statements of physicians, "particularly where they are unsupported by detailed objective criteria and documentation."[3] *See Buxton v. Halter*,

---

[3]ALJs are not bound by conclusory statements of treating physicians where they appear on "check-box forms" and are unsupported by explanations citing detailed objective criteria and documentation. *See Buxton v. Halter*, 246 F.3d at 773; *see also Hernandez v. Commissioner*, No. 1:14-cv-958, 2015 WL 3513863, at * 5 (W.D. Mich. June 4, 2015). "Form reports in which a doctor's obligation is only to check a box, without explanations of the doctor's medical conclusions are weak evidence at best[.]" *Smith v. Commissioner*, No. 13-cv-12759, 2015 WL 899207, at * 13 (E.D. Mich. Mar. 3, 2015); *see also Ashley v. Commissioner*, No. 1:12-cv-1287, 2014 WL 1052357, at * 8 n. 6 (W.D. Mich. Mar. 19, 2014) ("Courts have increasingly questioned the evidentiary value of 'multiple choice' or 'check-off' opinion forms by treating physicians[.]").

246 F.3d at 773.  Further, "an ALJ does not play doctor by evaluating the medical evidence because he is required to do so under the regulations."  *Wilkins v. Commissioner*, No. 13-12425, 2014 WL 2061156, at * 14 (W.D. Mich. May 19, 2014) (citing 20 C.F.R. § 404.1527(c)).  "Rather, an ALJ may  properly consider the lack of objective evidence supporting [the doctor's] opinion," and the "inconsistency of his opinion with objective testing results."  *Wilkins*, 2014 WL 2061156, at * 14.  The ALJ may elect to give less weight to an opinion when it fails to find support in the objective evidence and the other record evidence.  *See Curler*, 561 F. App'x at 471; 20 C.F.R. §§ 404.1527(c)(3), (4); *see also Newsome v. Colvin*, No. 7:14-cv-64, 2015 WL 5472943, at * 5 (E.D. Ky. Sept. 16, 2015); *Ellars v. Colvin*, No. 2:14-cv-2050, 2015 WL 4538392, at * 3-4 (S.D. Ohio July 27, 2015).  The Sixth Circuit has consistently held that inconsistencies between proffered restrictions and the underlying treatment records are good reasons for discounting a treating source's opinions.[4]  *See e.g., Hill v. Commissioner*, 560 F. App'x 547, 549-50 (6th Cir. 2014); *Fry v. Commissioner*, 476 F. App'x 73, 75-76 (6th Cir. 2012).

Here, the ALJ gave a more than adequate explanation of his consideration of Dr. Gadbois's RFC questionnaire responses and gave good reasons why he found that the

---

[4]Plaintiff's assertion that the ALJ rejected Dr. Gadbois's RFC restrictions because they were "untimely" (Plf. Brief at 10, Page ID 867; Reply Brief at 3, Page ID 1084) cannot withstand scrutiny.  The ALJ rejected the proffered restrictions because they failed to reflect plaintiff's functional limitations during the period at issue which ended on June 30, 2008.  (Op. at 12, Page ID 54).

opinions expressed therein were entitled to little weight. The Court finds no violation of the treating physician rule.

### 3.

Plaintiff disagrees with the ALJ's factual finding regarding her credibility. (Plf. Brief at 10-19, Page ID 847-56; Reply Brief at 3-5, Page ID 1084-86). Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The court does not make its own credibility determinations. *See Walters v. Commissioner*, 127 F.3d at 528. The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard. This is a "highly deferential standard of review." *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005); *see Ritchie v. Commissioner*, 540 F. App'x 508, 511 (6th Cir. 2013) ("We have held that an administrative law judge's credibility findings are 'virtually unchallengeable.'"). Here, the ALJ's factual finding regarding plaintiff's credibility is supported by more than substantial evidence.

### Conclusion

For the reasons set forth herein,  the Commissioner's decision will be affirmed.


Dated:   September 25, 2015                     /s/ Paul L. Maloney
                                         Paul L. Maloney
                                         United States District Judge